*Grigsby* for plaintiff.

---

## Moore's Executor *vs* Green's Adm'r.

·Error to the Harrison Circuit.

*Trusts and Trustees.    Lapse of time.*

Judge Marshall delivered the opinion of the Court.

Chancery.

Case .110.

*May* 10.

Upon a careful scrutiny of the pleadings and evidence in this case, we are of opinion that there is no ground for any decree in favor of the complainant, and that the bill should have been dismissed.

There is no doubt that some agency was committed to H. C. Moore, in regard to the two negro boys of the complainant, in 1823, when the complainant left Kentucky, and it is probable that under that agency, Moore controlled the hiring and the receipts for the hire of said negroes, and he may have been entitled to receive money for Green from some other sources: but there is no direct evidence of his having ever received one cent for Green, on any account, more than sufficient to reimburse his advances to Green when he left home. Nor is there any such evidence of the existence of any debt due to Green otherwise than for the hire of these negroes during his absence, which Moore might have received, except as to the debt from Cayson, who certainly did not pay any part of his debt to Moore. And with regard to the hire of the negroes, we think there is no reason to doubt that the note of James Green to Wm. Green for $400, was executed in consideration of the negro hire, which the former had been permitted by Moore to receive, or which had been paid over to him, and that this note includes all that was due to Wm. Green on account of

*The agent having been directed to deliver certain slaves in his possession to the vendee of his principal, buys them with his own money from the vendee of the principal, though he may have some funds of his principal in his hands at the time, no trust results from this circumstance, as it was not the removal of a lien, or the purchase of an adversary title.—*

MOORE'S EX'R.
*vs*
GREEN'S ADM'R.

negro hire up to the end of the year 1827. If therefore, H. C. Moore, or his executor, were accountable to Wm. Green for the hire of the negroes from 1823 up to the commencement of this suit, or to the sale of the negroes in 1833, this note for $400 having been paid, should so far have operated as a satisfaction of that accountability. But a more important consequence of the fact assumed in regard to the consideration of the $400 note is, that at the time when H. C. Moore paid to Lamme, who had Wm. Green's absolute bill of sale for the negroes, $900 for them, and received from Lamme a bill of sale to himself, he had in fact no money of Wm. Green's in his hands, or immediately at command, and that the whole sum thus paid, was in truth his own, although he may have been at that time accountable to Green for the amount of hire due from, or in the hands of Jas. Green. There was, therefore, no implied trust in his purchase of the negroes from Lamme, resulting from the fact that they were paid for with Green's money.

And although being the agent of Green with regard to the negroes, and having the control of Green's funds, collected or collectable, on account of their hire or otherwise, a trust might have arisen and been enforcible by the Chancellor within reasonable time, and on equitable terms, even if he had, with his own money, or without having any money of Green's actually in hand, relieved the negroes from a lien or incumbrance, or purchased in a title adverse to that of Green: yet, as there was no removal of any lien or incumbrance, and no purchase of any adverse title, there is no ground for any such implication. Green had absolutely sold the negroes to Lamme & Stowers, as is proved, not only by his bill of sale, and by the testimony of Stowers, but by his letter to Moore, advising him of the sale, and requesting him to deliver the negroes accordingly.

By this sale from Green to Lamme & Stowers, Moore was released from all further duty to Green, arising from his agency with regard to the slaves, except that of delivering them to the purchasers, and accounting to Green for the hire to the time of the sale. When, therefore, he afterwards purchased them in his own name from Lamme,

—Especially as the principal at the same time drew his bill upon the agent for the amount of funds in his hands in favor of vendee of the slaves.

MOORE'S EX'R.
*vs*
GREEN'S ADM'R.

at a full price, paying him the hire from the date of Green's bill of sale, and took from him the absolute bill of sale of Lamme & Stowers to himself, he was, upon the face of the transaction and of the written evidences of it, making a purchase for his own exclusive benefit; and as Green had then no title or interest whatever in the negroes, and therefore none which Moore was bound to protect or preserve, he was not only committing no breach of his trust or agency with regard to the negroes, in making a purchase for himself: but so far from being bound to purchase them in for Green, had no right to appropriate Green's own money for such a purchase, if he had then had enough of it in his hands; and such an appropriation of Green's money must have been at his own peril, even if it had not been forbidden by Green at the time. But when to the tenor of Green's bill of sale, and of his letter directing the delivery of the slaves to Lamme & Stowers, is added the fact, that he at the same time drew a bill upon Moore, requesting him to pay to Lamme & Stowers the sum of $500, which, as is evident from his subsequent conversation with Stowers, was at least as much as he supposed he had in Moore's hands, and which he requested Moore, in the letter already referred to, to pay according to the tenor of the bill, it is entirely clear that if Moore had then in his hands any money of Green, it would have been *a violation* of Green's directions, and of his trust, to have diverted it from the payment of the bill, which he in fact protested, to the purchase of the negroes even for Green's benefit. He could not have compelled Green to take the negroes thus purchased with Green's money, and avowedly for his benefit, but must, at Green's option, have been accountable for the money.

But purchasing, as he did, with his own money, and avowedly for his own exclusive benefit, when he was under no obligation to purchase or to hold for the benefit of Green, Green could not possibly have any further claim to the negroes, unless upon the ground of some new contract or promise obligatory in itself. There was not, at the time of the purchase, any intimation by Moore, that he was acting for the benefit of Green, or that he would give him the option of taking the negroes. And without

conceding that a mere declaration to that effect, founded on no obligation whatever, would have been itself obligatory, we are satisfied that neither such a declaration, afterwards made, nor even an acknowledgment that the purchase had been made for Green's benefit if he chose to take it, would be enforcible in equity for the want of consideration. The written evidences of the transaction show an absolute purchase by Moore for his own exclusive use. There is no cotemporaneous fact or evidence contradicting the tenor of the writings; and the only written evidence upon which an inference is attempted to be founded in favor of Green's claim, is the indorsement of Moore upon the bill of exchange above mentioned, to the effect, that ''having no funds in his hands, after making settlement with Wm. Lamme, on account of a bill of sale of two slaves, he cannot discharge the within order.'' It is argued that this indorsement shows that Moore had funds of Green in his hands, which he had appropriated to the purchase of the two negroes. But this is certainly going beyond the literal import of the indorsement, which does not necessarily mean any thing more than that the person making it had exhausted all his funds in getting a bill of sale, &c. It is true, in general, that the drawee of a bill might be understood to account by such an indorsement for the funds of the drawer, and not for his own, as the bill might be supposed to be payable out of the funds of the drawer and not of the drawee. But it is to be recollected, in the first place, that independently of this indorsement, the fair conclusion from the facts is, that Moore had no money of Green in hand; and again, that if there had been money of Green's then in his hands, he was required, not only by the bill but by the accompanying letter, to pay it on the bill, and it was no response to that requisition, or excuse for non-compliance with it, for him to say to Green that he had paid all his money for the negroes. But with his own money he had a right to do as he pleased, by purchasing the negroes, and either paying or protesting the bill, and yet as the brother-in-law of Green, and as his agent, having had control of his negroes, he might have been expected to pay the bill with his own

money, if he had no other, looking to future collections for his reimbursement, and might therefore have thought it proper to state why he had no money of his own with which to pay it. And this inference, according as it does with the conclusion that Moore had in fact no money of Green's then in hand, is corroborated by the circumstance that Green, dissatisfied with the non-payment of the bill which had been returned to him by Stowers, authorized Stowers, on coming to Kentucky, in 1828, to settle with Moore, alledging that there was in his hands several hundred dollars of his for negro hire and debts left by him to be collected; when Moore, on a settlement being demanded, stated that a horse and some money which he had furnished to Green when he went away, amounted to more than he had collected for him, and he had nothing in his hands belonging to Green; and there seems to have been nothing said either by Green or Stowers or Moore, up to that time, about any part of Green's money having been applied to the purchase of the negroes, or about the purchase having been made for Green's benefit.

It appears however, that at some period, prior to 1830, Moore being apprized of Green's dissatisfaction with him, for which no cause appears, except the non-payment of the bill, and conscious perhaps that he might have had in his hands negro hire almost enough to have paid the bill, if he had not left or put it in the hands of James Green, he may have made some declaration of an intention to let Wm. Green have the benefit or some benefit of his purchase, and Stowers says, that he wrote to him requesting him to come home and he would then settle with him and do what was right; and that he said in that letter he had paid Lamme & Stowers $900 with Green's money. This letter is not produced, but Stowers, deposing ten years afterwards, speaks of its contents, and three other witnesses speak of Moore's having said at different periods, not distinctly designated, that he had *redeemed or saved the negroes for Green*—and, (as two of them state,) wholly or in part with his funds. But as every attempt of these witnesses to designate the fund from which the money could have been realized is incon-

sistent with the facts, we can but suppose that the witness-
es, speaking after a great lapse of time, may have blend-
ed their own inferences with the statements of Moore.
It may be that Moore said, on these occasions, that Green
might have the negroes, or the benefit of his purchase,
but if he did, or even if he said he had saved or redeemed
the negroes for Green, these gratuitous declarations would
neither have changed the nature of the original transac-
tion nor have given Green a right to claim, without evi-
dence, that his own absolute bill of sale was but a mort-
gage, and that Moore's absolute purchase was a redemp-
tion for his benefit. And we cannot admit that when the
fact of Moore's having Green's money in hand at the
time of purchasing the negroes, might, if it existed, have
been directly proved, and when it might have been shown
who paid him, and how much he had received, such proof
is to be supplied by the testimony of witnesses, taken
six years after Moore's death, detailing his separate ad-
missions, inconsistent with themselves, as well as with
the facts otherwise appearing, and especially with the un-
equivocal evidences of title which this testimony is in-
tended to impair. The intrinsic weakness of such evi-
dence of admissions has often been pointed out; and
the danger of admitting parol evidence to create or prove
a trust or obligation, inconsistent with the unequivocal im-
port of solemn instruments, framed as permanent me-
morials of contracts and titles, the great caution with
which it should be received in any such case, and the
clearness and certainty with which the facts on which the
trust or obligation is to be founded must be established,
have been too often announced from the bench to need
repetition now. In view of these principles, and of the
circumstances which tend directly to show that Moore
had no money of Green's at the time of his purchase,
and that he could not have had as much as $900; and
as we cannot omit to add, in view of the evidence fur-
nished by Moore's will, of his determination to discharge
towards Green all the obligations not only of justice but
of kindness and liberality, we cannot avoid the conclu-
sion that there is no foundation for any claim against him,

on account of these negroes, after the sale to Lamme & Stowers.

Several circumstances tending to support this conclusion have been omitted, among which we will barely mention: 1st. The failure of Green, (who has preserved the ambiguous endorsement on the bill of exchange,) to produce the letter of Moore, referred to by Stowers, or any other, recognizing his interest in the negroes or the money paid for them. 2d. The silence of the witnesses, who now depose to Moore's declarations and admissions, and who seem to have been connections of Green as well as of Moore, while the latter claimed and exercised ownership over the negroes from 1828 to 1832, when he died, and while his executor had them appraised and sold as his property. And 3d. The failure of Wm. Green himself, whose residence was known to these witnesses, and who seems to have been apprised of the fact that Moore had taken the bill of sale to himself, to make any assertion of his claim, even by letter or word, for ten years, and until more than five years after the death of Moore. He was, it is true, a resident of Santafe, in Mexico, during a great part of that period : but the record shows that he was anxious to transfer his funds in Kentucky to that place, and that there were means of communication available for that purpose.

Upon the facts and presumptions apparent on the record, we repeat that we are of opinion that there is no foundation for this claim. And moreover, as H. C. Moore, and after his death, his executor openly claimed the negroes as the individual property of Moore, and therefore, in violation of the alledged trust, for upwards of five years before the commencement of this suit, we are of opinion that the statute of limitations relied on is applicable to the case, and constitutes a complete bar to the relief sought.

Wherefore, the decree is reversed and the cause remainded, with directions to dismiss the bill.

*Crittenden, Cates & Lindsey* for plaintiffs : *J. T. Morehead and Trimble* for defendants.

MOORE'S EX'R.
*vs*
GREEN'S ADM'R.

Circumstances in the proof against the claim of complainant.

Five years adverse possession of slaves by the executor of one charged to be a trustee, held to be a bar in equity from the enforcement of such claim.